# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 25, 2007 Session

## PAUL WELCOME v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Knox County
### No. 69872    Mary Beth Leibowitz, Judge

---

### No. E2006-02022-CCA-R3-PC - Filed November 28, 2007

---

The petitioner, Paul Welcome, appeals the denial of his petitions for post-conviction relief and writ of error coram nobis. He asserts he was denied the effective assistance of counsel at trial and that he is entitled to relief based upon newly discovered evidence. Discerning no error, we affirm the judgments of the post-conviction court.

### Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

D. David Sexton, II, Knoxville, Tennessee, for the appellant, Paul Welcome.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner was convicted in August 1996 of first degree murder for the shooting homicide of the victim, Gregory Pate, and sentenced to life with the possibility of parole. On direct appeal, this court affirmed. *See State v. Paul Lavell Welcome*, No. 03C01-9709-CR-00386 (Tenn. Crim. App., Knoxville, Dec. 3, 1998). Our supreme court denied permission to appeal in May 1999. The facts of the case were summarized by this court on direct appeal as follows:

> The defendant's conviction relates to the killing of Gregory Pate. Mr. Pate was shot in his home in a Knox County public housing project on April 14, 1995. The key issue at trial was whether the defendant or his brother, Steven Lavon Welcome, was the shooter. Both the defendant and his brother were indicted for the premeditated first degree murder of Mr. Pate. A second count of the

indictment alleged felony murder in the perpetration of a robbery. The cases were separated for trial, and the defendant's case was called for trial first.

The state's first witness was Dr. Sandra K. Elkins, a forensic pathologist and the Knox County Medical Examiner. Doctor Elkins performed an autopsy of the victim and determined the cause of death to be a gunshot wound to the head. The wound entered the victim's head in the right temporal region and traveled to the back left of the skull. There was no exit wound. Doctor Elkins found no evidence of stippling or tattooing, which indicated to her that the shot likely had been fired from a distance greater than 18 to 24 inches. . . .

Angela Johnson, Steve Welcome's former girlfriend, testified that the defendant and his brother came to her apartment on April 14, 1995. The three went to the Welcomes' mother's house, and the defendant and his mother got in an argument which culminated in the defendant's mother putting the defendant's clothing in the yard. The defendant was mad after this confrontation; however, he had also been mad earlier because someone owed him money. The Welcomes and Johnson set out on foot toward a Knox County public housing project. Johnson inquired where they were going, but neither of the Welcomes responded. They reached one of the units, and the defendant went in without knocking. Steve Welcome and Johnson followed. The victim, a man and a woman were inside. The man and the woman went out the back door to a porch. Johnson could see them through a screen door.

The defendant asked the victim for his money. The victim responded that he did not have any money for the defendant and would pay later. Johnson sat down in Steve Welcome's lap in a chair beside the kitchen table. An argument between the defendant and the victim commenced, and the defendant and the victim "wrestled." The defendant pulled a gun from his shorts and told the victim that the defendant would have to do something to him if he did not produce the money. The defendant hit the victim in the mouth with the gun, and Johnson ran out the door. Steve Welcome followed her to the door but did not come outside. When Johnson left, the defendant was standing in front of the kitchen table and the victim was sitting on the table. About three minutes after she went outside, Johnson heard a gunshot. Steve Welcome came outside, and the two

ran away. Paul Welcome came outside with a black briefcase and fled on foot, as well.

After the murder, the Welcomes came to Johnson's home and discussed the crime. The defendant tried to get Johnson to make up a story about the victim having a weapon.

James Harris, who is also known as Orlandas Robinson and claims the latter is his real name, gave what appears to have been animated and sometimes inconsistent testimony. Harris was the victim's roommate on April 14, 1995. The victim was a cocaine addict, and he owed the defendant money for cocaine. The defendant came to Harris' and the victim's home about once a week wanting his money. On April 14, the defendant came to collect this debt. He was accompanied by his brother and his brother's girlfriend. They had a small black case with them. The defendant asked the victim if he had the money, and the victim said he would have it at the end of the month. Harris walked out the back door and stood on the porch. Later, he admitted he might have been sitting, rather than standing. He could see what was taking place inside through the screen door. The Welcomes commenced beating the victim, and Steve Welcome's girlfriend went outside. Harris testified both that the victim received the beating on the table and in a corner. The victim hit one of the Welcomes, then the defendant gave the victim some cocaine. Later in his testimony, Harris said Steve Welcome gave the victim the cocaine. The victim "went . . . to do" the cocaine, and the defendant, who was on the victim's right side, shot the victim in the head. Later, Harris claimed the victim smoked the cocaine, everything was quiet in about two or three minutes, and then the defendant shot the victim. At the time of the shooting, Steve Welcome was on the left side against the table. Harris said later in his testimony that the victim was standing in the door between the Welcomes, with Paul to his right and Steve to his left. He first denied and then admitted he was talking to a neighbor when he was outside on the porch. He also said he was watching his girlfriend walk across a parking lot. Throughout his testimony, Harris remained steadfast in his identification of the defendant as the shooter.

After the shot, Harris fled the porch and called 911. Later, he said he went back in the house to check on the victim first, then went to call 911. He was scared of the defendant, so he told the 911 operator that his name was James Harris, rather than Orlandas Robinson. Later, when Harris was questioned by the police, he said

-3-

he did not know where Orlandas Robinson was. During questioning, Harris identified the shooter as "Paul" and picked Paul Welcome from a group of photographs.

Not surprisingly, the defense conducted a vigorous cross-examination of Harris. In addition to the inconsistencies highlighted above, Harris said the man who shot the victim was about 5'8", and he denied telling the detectives that the shooter was around 5'2" to 5'4". He admitted that Steve Welcome is shorter than the defendant. He said the shooter did not have braided hair and denied telling the detective that he did. He admitted Steve Welcome's hair was braided. The witness was cross-examined about the tape of his call to 911, which was played for the jury. In the tape, the defendant says that a man has been shot and that he heard the shot, but he never says that he saw the shooting. Harris was evasive and equivocal about whether he mentioned the presence of cocaine at the scene of the crime to the detective.

Detective Tom Pressley of the Knoxville Police Department was assigned to investigate the victim's homicide. He interviewed James Harris, who knew the shooter as "Paul" and picked a photograph of Paul Welcome from about 800 others. Harris was very scared when he was interviewed. Harris told Detective Pressley that the Welcomes had the victim pushed back over a table, and the defendant shot him. Harris described the defendant as having braided hair and being "about 5', 5'4", 5'2", 5'3"." Detective Pressley did not recall whether the defendant had braided hair when he turned himself in the day after the crime. Harris eventually admitted that he and Orlandas Robinson were the same person. . . .

The defense began its case-in-chief with the testimony of Brian Hicks, who had recently been incarcerated with Steve Welcome. Hicks claimed that Steve Welcome said that he and his brother had gone to the victim's house to get some money that the victim owed Paul Welcome. The victim did not want to pay, so Steve Welcome stuck a gun in his face and shot him.

Barry Rice, a private investigator, took a video of the crime scene for the defense. The video was played for the jury, and Rice narrated what was depicted. The video shows the exterior and interior of the victim's home, including views from both sides of the screen door through which Harris claimed to have witnessed the

-4-

murder. On the video, it is difficult to see into the house from outside the screen door. . . .

    The jury found the defendant guilty of first degree murder, and the trial court imposed a life sentence.

*Id.*, slip op. at 2-7 (footnotes omitted).

    The petitioner filed a timely petition for post-conviction relief in January 2000, alleging that he had been denied the effective assistance of counsel, that the State had failed to disclose exculpatory evidence, that the trial court erred by permitting the jury to separate, that media coverage of his case prejudiced the jury, and that the jury instructions were improper. The post-conviction court ruled that the petitioner had presented a colorable claim for relief and appointed counsel. After numerous motions for extension of time were granted, the petitioner filed an amended petition for post-conviction relief on April 15, 2002. The State filed a response to the petition in July 2002.

    Then, on February 10, 2005, the petitioner filed a petition for writ of error coram nobis asserting that he was entitled to a new trial based upon newly discovered evidence. Specifically, he contended that his brother, whose physical description more closely matched the description of the perpetrator given by the State's eyewitness, had confessed to killing the victim.

    An evidentiary hearing was held in two parts on December 13, 2005, and April 21, 2006. The testimony of the petitioner's trial counsel was taken by telephone deposition because trial counsel had closed his law practice and moved to Japan. Counsel testified that he hired an investigator and attempted to locate and interview each of the State's witnesses prior to trial. He was unable to locate James Harris, who was the primary witness for the State. Counsel recalled that he was "totally caught off guard" when Mr. Harris claimed at trial that his real name was Orlandoas Robinson, but he maintained that he had done his best to thoroughly cross-examine the witness. He stated that he chose not to "press" Mr. Harris on certain issues, particularly with regard to the description he provided of the perpetrator, because he was afraid of what Mr. Harris might say. Counsel confirmed that Mr. Harris had consistently maintained that the petitioner was the shooter, and that, despite the fact that the physical description he provided did not match the petitioner, Mr. Harris was familiar with the petitioner because he had seen him at the victim's house prior to the day of the shooting.

    Counsel insisted that he felt he had done a good job of discrediting Harris and "made a judgment call" to "leave well enough alone" and not pursue every issue with the witness. Counsel recalled that he had pulled the criminal histories of several individuals named "James Harris" and had attempted to locate a criminal history for "Orlando Robinson." He did not use them to impeach the witness, however, because he had no way to verify that the witness was the same person listed in the criminal history. When confronted with a criminal history for a "James Earl Harris" from

Texas, Counsel explained that he did not believe the trial court would have allowed him to utilize the criminal history during cross-examination because of doubts about the witness's identity.

Counsel recalled that the primary theory of the defense was that the petitioner's brother, Steve Welcome, had committed the murder. He called Steve Welcome's cellmate, who testified that Steve Welcome had admitted shooting the victim. According to Counsel, sometime after the conclusion of the trial, Steve Welcome approached him at the courthouse and admitted that he had shot the victim. Counsel stated that he relayed the information to the petitioner's post-conviction counsel.

Greg Harrison, who was the prosecuting attorney in the petitioner's case, testified that he was aware prior to trial that the petitioner had asserted that Steve Welcome was the shooter. He stated that prior to trial, Steve Welcome told police that the petitioner was the shooter. When asked whether he would have tried the petitioner for first degree murder if Steve Welcome had confessed to the killing prior to trial, Mr. Harrison responded, "I don't know. Stevie Welcome was not credible at all."

Mr. Harrison testified that he first learned from Counsel that James Harris was also known as Orlando Robinson and that he made the witness available to Counsel just before trial to explore the issue but Counsel declined. Mr. Harrison stated that he did not believe that Mr. Harris was an "impressive" witness because of his "mannerisms" but noted that Mr. Harris "never wavered at all" in his identification of the petitioner "as being the person who committed the crime." Similarly, Mr. Harrison recalled that although Mr. Harris "was not firm" in his description of the shooter, he was firm that the petitioner was the shooter. Mr. Harrison testified that he believed that Counsel was very effective at trial, particularly as it related to the cross-examination of Mr. Harris.

Kim Parton, who had been appointed to represent Steve Welcome for his role in the victim's murder, denied that Steve Welcome told her that he had shot the victim. She also indicated that she likely would not have believed Steve Welcome if he had confessed, noting that she "was hard pressed to believe anything that came out of his mouth." She noted that Steve Welcome had at various times manipulated the criminal justice system to his advantage. Ms. Parton acknowledged that Steve Welcome's "criminal history and his attitude and demeanor" led her to believe that "it was far more likely that he was the trigger person than his brother who did not have a criminal history." She also acknowledged that "the physical evidence pointed to the fact that [Steve Welcome] very well could have been the shooter." She recalled that Steve Welcome was "very happy" about the plea agreement she reached with the State. She also observed that Steve Welcome did not make his written confession to the crime until after jeopardy had attached and he had served his sentence under the terms of the plea agreement.

Steve Welcome testified that on the day of the shooting, the victim and the petitioner "had a discussion about some money. And they got to sort of like arguing and . . . like tussling somewhat. [The victim] . . . reached behind his back . . . two or three times. And I told him twice . . . not to reach. . . . And he reached again so . . . I shot him after that." Steve Welcome recalled that

he shot the victim in the right temple with a gun that belonged to him. He stated that after the shooting, he hid from police and instructed his girlfriend, Angie Johnson, who had been outside during the shooting, to "keep [him] out of it" and tell police she had seen the petitioner with a gun. He admitted telling the police that the petitioner had shot the victim, explaining that he did so because he was angry with the petitioner for turning himself in and for starting the fight with the victim. Steve Welcome insisted that he told Ms. Parton prior to trial that he was the shooter, and that she warned him not to say that again. He stated that he confessed the shooting to Counsel after the petitioner's trial because he "felt bad" that his brother was going to prison for life. He acknowledged that he was aware that jeopardy had attached and that the State could not prosecute him for shooting the victim.

The petitioner testified that Steve Welcome shot the victim while the petitioner and the victim were fighting over money the victim owed the petitioner. The petitioner, who recalled that the primary theory of defense was that Steve Welcome was the shooter, acknowledged that Counsel had vigorously cross-examined James Harris on the issue of his true identity, that Counsel had presented the testimony of a "jailhouse snitch" who testified that Steve Welcome had confessed to shooting the victim, and had presented a videotape of the murder scene that was designed to show that the shooting could not have happened in the manner described by Mr. Harris. Although he maintained that Counsel should have interviewed Mr. Harris prior to trial regarding his use of the alias Orlando Robinson, the petitioner admitted that he knew Mr. Harris prior to trial and acknowledged that Mr. Harris was present outside the victim's apartment at the time of the shooting.

At the conclusion of the evidentiary hearing, the post-conviction court took the petition under advisement and later issued detailed findings of fact and conclusions of law. The post-conviction court observed that "[w]hether or not [the petitioner] was the actual shooter," the "evidence presented was sufficient to sustain a first degree murder conviction in light of the charge given to the jury of criminal responsibility for conduct of another." The post-conviction court noted that "[t]here was ample proof in the record that these two men w[]ere the only ones in the house with [the victim] and that they basically pointed the finger at one another." The post-conviction court concluded:

> While it seems painfully unfair to [the petitioner] that he should sustain a conviction for life in prison while Mr. Steve Welcome has long since [come] out of his sentence in this case and then admitted to being the shooter, [the petitioner] is as culpable under the theory of criminal responsibility for another and thus there is no showing of harm to [the petitioner] as a result of the allegations of unfair trial, or ineffective assistance of counsel. [Counsel] has met the standards of *Baxter v. Rose*, 523 S.W.2d 930, (Tenn. 1975) and *Strickland v. Washington*, 466 U.S. 668, 694 (1984), and this petition for post-conviction relief is hereby respectfully denied.

In a subsequent order, the trial court similarly denied the petition for writ of error coram nobis.

*I. Petition for Writ of Error Coram Nobis*

In this appeal, the petitioner asserts that he is entitled to coram nobis relief on the basis of Steve Welcome's confession, which he asserts constitutes newly discovered evidence. A writ of error coram nobis is an extraordinary remedy by which a trial court may provide relief from a judgment under narrow and limited circumstances. *State v. Mixon*, 983 S.W.2d 661, 668 (Tenn. 1999). The grounds for coram nobis relief are narrow:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

T.C.A. § 40-26-105(b) (2006). The decision to grant or deny the petition lies within the sound discretion of the trial court. *See id.*; *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995).

We conclude that Steve Welcome's confession does not constitute newly discovered evidence. The record establishes that Counsel was aware prior to trial that Steve Welcome had confessed to his cell mate, Brian Hicks, and, in fact, offered evidence of Steve Welcome's confession into evidence at trial. Moreover, serious questions exist regarding Steve Welcome's credibility. The timing of the written confession, given after Steve Welcome had served the sentence he received pursuant to a plea bargain for his role in the victim's murder, renders the confession suspect. In addition, Ms. Parton noted Steve Welcome's complete lack of credibility and his history of manipulating the criminal justice system. Under these circumstances, Steve Welcome's confession does not satisfy the requirement of veracity. *See State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007) ("[T]he trial judge must first consider the newly discovered evidence and be 'reasonably well satisfied' with its veracity."); *see also Mixon*, 983 S.W.2d at 672-73. Finally, as observed by the post-conviction court, the evidence was sufficient to support the petitioner's conviction for first degree murder under a theory of criminal responsibility even if Steve Welcome actually fired the fatal shot. In consequence, the trial court did not abuse its discretion by denying coram nobis relief.

*II. Ineffective Assistance of Counsel*

The petitioner also asserts that he was denied the effective assistance of counsel at trial. He contends that his trial counsel failed to "interview, appropriately cross-examine, and impeach the witness, James Harris;" failed to "demonstrate for the jury the physical difference between Steve Welcome and Paul Welcome;" and failed to "interview, prepare for, and cross-examine[] the witness, Angela Johnson." The State contends that the petitioner failed to establish his claim by clear and convincing evidence.

-8-

The petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, the findings of fact made by the trial court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). The error must be so serious as to render an unreliable result. *Id.* at 687. It is not necessary, however, that absent the deficiency, the trial would have resulted in an acquittal. *Id.* at 695. Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

*Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001); *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

*A. Claims regarding James Harris*

The petitioner contends that Counsel should have interviewed James Harris prior to trial, should have "appropriately" cross-examined him, and should have more effectively impeached him. Counsel testified that although he attempted to locate James Harris prior to the day of trial, he was unable to do so. He also stated that he did not interview Mr. Harris on the day of trial even after learning that he was present in the courthouse. Counsel also conceded that he was "caught completely off guard" when the witness testified that he also went by the name Orlando Robinson. Nevertheless, Counsel believed that he had effectively cross-examined the witness regarding the inconsistencies in his statements regarding the murder, the description of the perpetrator, and his alias and true identity. Counsel also introduced into evidence a videotape of the crime scene that called into question Mr. Harris's description of the events. When asked why he did not pursue other avenues of questioning, Counsel responded that he "made a judgment call" to "leave well enough alone" because he feared that any further questioning might be unfavorable to the petitioner. Counsel also testified that he did not use any criminal history to impeach the witness because it was his belief that the trial court would not have allowed him to do so given that doubts existed as to the witness's true identity.

Mr. Harrison testified that he believed that Counsel's cross-examination of Mr. Harris was particularly effective and recalled that he was glad when it was over. In addition, this court noted on direct appeal that the cross-examination of Mr. Harris was "vigorous." The record establishes that Counsel diligently cross-examined Mr. Harris regarding the fact that the description he provided of the perpetrator did not match the petitioner and the fact that he did not reveal his "real name" until the day of trial. In our view, the petitioner has failed to establish that Counsel's performance was deficient, and he is not entitled to relief on this issue.

*B. Physical Differences between the Petitioner and Steve Welcome*

The petitioner also asserts that Counsel was ineffective by failing to "provide the jury with the opportunity to see with their own eyes the dramatic physical differences between" the petitioner and Steve Welcome. He states that because Steve Welcome more closely matched the physical description provided by Mr. Harris, the outcome of his trial would have been different. Counsel testified that he did not call Steve Welcome as a witness because at the time of trial, Steve Welcome maintained that the petitioner had shot the victim. In addition, because the case against Steve Welcome was still pending at the time of the petitioner's trial, Counsel was "quite concerned that [Steve Welcome] was going to perhaps end up being a witness in the case against [the petitioner], reaching some kind of plea agreement and testifying." Moreover, Counsel stated that he did not want to push the issue given that Mr. Harris had equivocated in his description of the perpetrator but had consistently maintained that the petitioner, a man with whom he was previously familiar, was the shooter. Mr. Harrison confirmed that although Mr. Harris "was not firm" in his description of the perpetrator, "he never wavered" in his identification of the petitioner as the individual who fired the fatal shot. Again, the petitioner has failed to establish by clear and

-10-

convincing evidence that Counsel's performance was deficient and is not entitled to relief on this issue.

### C. Claims regarding Angela Johnson

Finally, the petitioner contends that Counsel was ineffective by failing to interview and "appropriately" cross-examine Angela Johnson. The petitioner asserts that Counsel should have made more of an effort to locate the witness prior to trial and should have cross-examined her with inconsistencies in her statement and that provided by Steve Welcome prior to trial.

Counsel testified that he attempted to locate Ms. Johnson prior to trial but was unable to do so. He admitted that he might have been able to locate the witness through her mother but did not think of that prior to trial. Counsel stated that he did his best to thoroughly cross-examine Ms. Johnson, whom he believed to be a credible witness. Mr. Harrison agreed that Ms. Johnson was a credible, strong witness and that Counsel had done a very effective job in cross-examining her.

We cannot comprehend how Counsel was ineffective by failing to attempt to impeach Ms. Johnson with the pretrial statement of another witness. Although the petitioner points to inconsistencies between the testimony provided by Ms. Johnson and the pretrial statement of Steve Welcome, he has failed to note any inconsistencies in the accounts provided by Ms. Johnson herself. Moreover, if Counsel had attempted to use Steve Welcome's statement during trial, he would have been faced with the fact that, in that same statement, Steve Welcome asserts that the petitioner shot the victim. Finally, the point that the petitioner apparently wanted to be made, that Ms. Johnson made no mention of a black case carried by one of the two Welcome brothers, is of very little probative value and would not have, in our estimation, made any difference in the outcome of the trial. The petitioner is not entitled to relief on this issue.

## CONCLUSION

The petition does not satisfy the requirements for coram nobis relief, and the petitioner was not denied the effective assistance of counsel. Accordingly, the judgments of the criminal court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-11-